Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you, please be seated. Good morning and welcome to the first session of the 2025-2026 term of court. We're ready to hear argument in our first case. Mr. O'Connor. Good morning, Your Honor. John O'Connor for CACI. We would like to reserve four minutes for rebuttal. All right. May it please the Court. No oral argument can do justice to all of the legal issues involved in this appeal. We'll answer the Court's questions on any topic, but I intend to focus today on extraterritoriality and implied causes of action. The reason this case raises so many important legal issues is because the case is completely unsuited for federal court litigation, where no statutory cause of action. And yet this is the sixth time it's been up here, so we've been litigating it. We have, Your Honor, and I would say I'm hoping this is the last time. There's no statutory causes of action for these claims, and the state secret's privilege deprives the district court of much of its truth-seeking abilities. Congress and the executive created an administrative claims regime for exactly the type of detainee abuse claims that plaintiffs assert here. Under that process, there will be no issues with extraterritoriality or implied causes of action or sovereign immunity or preemption or state secrets. As this Court recently reaffirmed in Oriana, and as the Court has held in other cases such as Dyer and Bulger, the existence of alternative remedial procedures counsels against judge-made causes of action. And that's true even if those procedures are not as effective as an individual damages remedy. This case demonstrates the wisdom of that approach. Well, even if, I'm assuming you want to go back and say that the only thing we can consider is piracy, safe conduct for ambassadors, etc. However, Breyer and Sosa equated the torturer with the pirate and the slave trader. And I forget the exact phrase that he used. I think it was something to the effect, hostus humanae generis, meaning that the enemy of all mankind. So why didn't torture, a cause of action that can be considered under the alien tort statute? Well, a few things, Your Honor. First, this Court doesn't need to hold that the ATS is limited to the three causes of action contemplated by the First Congress in order to direct dismissal of this case. Because this case is not a torture claim. The torture claim was dismissed. But it's a conspiracy case, and there is case law that says secondary liability, such as aiding and abetting. Obviously, conspiracy is a secondary liability. I don't understand why we can't maintain a conspiracy case in this scenario. Well, if we're talking just about whether the district court has the power to imply a cause of action, when you get into secondary liability, and here it's not normal secondary liability. You have two levels of secondary liability. You have individual interrogators being liable on a co-conspirator theory for the actions of U.S. soldiers in a war zone. And then, to get to CACI, you have to apply a second level of vicarious liability to hold CACI vicariously liable for the vicarious liability of its employees. I think the Supreme Court has been clear in cases like Janus Capital Corp. in Central Bank of Denver, that the decision whether to allow a secondary cause of action is a delicate one. And not only whether to allow it, but how far to let it spin out is a delicate matter that's best left for the legislative process. The second point is, beyond the judge-created cause of action issue that we have here, this case is fundamentally extraterritorial. This case involves injuries that occurred in Iraq. It involves an alleged conspiracy based entirely in Iraq. It holds CACI liable for the conduct of U.S. soldiers in a war zone. How is the conspiracy entirely in Iraq? I thought the contract itself was made here in the United States and with the United States military. It was, Your Honor, but that's not conspiratorial. Making a contract is not conspiratorial. The only conspiracy that the district judge found sufficiently supportive to instruct the jury on was one solely between CACI, really three CACI interrogators in Iraq and U.S. soldiers. This is what the district court instructed the jury. Plaintiffs do not allege that any CACI personnel, including Steve Stefanovich, Daniel Johnson, or Timothy Dugan, directly mistreated them. Instead, they claim that these CACI interrogators conspired with Army military personnel to torture or inflict CIDT on detainees in the hard site, which resulted in plaintiffs being tortured or subjected to CIDT. That's in the appendix at 7718 and 1-9. But there was also activity in the United States, such as reports, supervision, etc., and also a cover-up. Why do you say there's no overt acts of a conspiracy in the United States by CACI? Well, Your Honor, in the United States, there was no activity that was conspiratorial in nature, which we believe is the appropriate question. If ATS's focus is the conspiracy and not... What about the alleged cover-up that Judge Floyd mentioned? Your Honor, there's no evidence in the record of a cover-up in the United States. What plaintiffs point to is the Army asked CACI to remove one interrogator from the contract, but explicitly said, if you'd like us to reconsider this, let us know, submit something to us. That was the contracting arm of the Army, and the operational folks in the Army wanted CACI to keep the employee because he was doing important work, so CACI asked for reconsideration. That reconsideration was denied. CACI took the employee off the contract, and that was the end of it. Your Honor, six years ago, this court... That last one's right. It seems like the court has made clear that the way we look at the extraterritorial question is the focus of the statute, here, the Alien Tort Statute. It seems like the last ruling from the district court on this point, while it referenced that a little bit, really was holding firm on the Al-Shamari III decision. So, this case kind of went to the jury on extraterritorial analysis that seems pretty clearly outdated under the subsequent Supreme Court cases. Do you agree with... Am I right that under the focus test, what we're looking for is the focus of the statute, and not specifically the cause of action? That's right, Your Honor, and we agree with Your Honor's characterization of what occurred at the district court. The district court's opinion did mention the focus test, but then said a mechanical application of the focus test to reject these claims would not be appropriate because it didn't meet the district court's view of the policy interests underlying the presumption against extraterritoriality. And so then the district court went and considered things like CACI status as a U.S. corporation, citizenship of CACI and its employees, a contract was issued in the United States, and we know from, and I think it's Abitron, it looks like it should be Arbitron, but I think it's Abitron, held that interests, statuses, parties, those are not relevant considerations. It's conduct. So you start by identifying the focus. The focus of the statute. So a plaintiff has the authority, or subject to some other arguments, to fashion their cause of action the way they see fit. But the extraterritorial application, you can't change our focus from what the statute is prohibiting. That's right, Your Honor, because the focus test and the presumption against extraterritoriality at bottom are tools of statutory construction that must be followed. And so you have to find the focus of the statute. And our view, and it was the United States' view in the Supreme Court in Nestle, is that the statute's focus is the primary tort. So that brings up another question I have that I haven't seen a whole lot of indication that it's been considered. The statute provides district courts with jurisdiction for a tort involving international violation of the law of nations. Correct. So what work, or what's the significance of tort in the statute? It seems as if we're almost saying that the violation of international law is itself a tort. And the question is whether that is right, or whether there must be a tort, a pre-existing recognized tort, that the violation of international law fits into. I think as I read the case law, the understanding from Sosa, the court's view of the understanding at the time of the enactment of ATS is that the tort had to be a conduct that was tortious in nature and in violation of the law of nations. Well, let's look at it this way. Tort is obviously a wrong, physical harm to somebody for which there should be a remedy. The statute also says treaties, and we have the Geneva Convention, which clearly prohibits torture against detainees or prisoners. And certainly that is a modifier of the international norms, that torture is recognized internationally as something that is not acceptable in a civilized society. Oh, we agree with that wholeheartedly, Your Honor. And so why, if torture, which is a form of assault and battery, which is a tort, why isn't that satisfied? Your Honor, we do not quarrel at all with the principle that torture is a violation of the law of nations. We don't quarrel with that at all. But Sosa is a two-step process. The first step is, is the proposed cause of action a clearly defined and universally recognized violation of the law of nations? We don't dispute that at all. And what is it? Is it torture? Well, we think torture qualifies, for sure. Okay, all right. But then, as Sosa makes clear, there's a... Before you get to the second problem, I'm sorry to interrupt you there, but Judge Floyd mentioned that torture could be battery. I think that's a fair comment. I'm just trying structurally to see how we do this. Do we look at the alleged violation of international norms or treaties and say, well, if it seems analogous to a tort, that's enough? Or do we have to identify a tort and show the elements of the tort? I mean, for example, if it was battery, there are elements of battery, and torture might well satisfy those. But do we have to formalistically identify the tort, or do we just have to determine that the alleged violations of norms themselves are tortious, I guess, in some sort of metaphysical sense? I think the latter, Your Honor. Clearly, I think all torture is a battery, but not all batteries are torture. Planets did have common law battery claims and the like, and those were all dismissed with prejudice. So we really are dealing with the second prong of the Sosa Jesuit test. What's the authority that says, when you said the latter, you think Sosa says that? I think Sosa's the best explanation of it, Your Honor. Okay, you can move on. I'll look at that. And the second half of the test, though, is basically the standard Bivens test. Is there any sound reason, once we've found that we've got a recognized violation of the law of nations, are there reasons that we ought to let Congress lead the way in deciding and defining any cause of action? But Bivens is, well, let me back up. Back to the battery first. The argument is there's a conspiracy in this case. It has to have overt acts. Does it matter that, for example, the causes of action like battery, et cetera, were dismissed? As it relates to the evaluation of a conspiracy and its overt acts, cannot a battery still be the overt act that supports the conspiracy claim? Well, Your Honor, I think conduct that would qualify as torture would certainly qualify as a battery. And the fact that the common law accounts were dismissed I don't think changes the court's analysis. But there's at least four reasons why, under the Nestle, Goldie, Bivens analysis, this court should defer to Congress. Well, isn't Bivens a court-created situation? It is, Your Honor. If that's true, in this case there is a statute, not a court-created statute overriding the whole thing, which has to be filled in, obviously, by Congress or by the courts. But where there is a significant violation of international norms, why is it that the court can't touch that? Well, for the same reason that the court couldn't touch the claims against Nestle and Cargill. I mean, everyone would agree that forced child labor is abhorrent, is a violation of the law of nations. Everyone would agree with that. But it's a question of, as Your Honor said, a substantive cause of action has got to be filled in by either Congress or the courts. And the Supreme Court's been pretty clear about which of those it ought to be. It ought to be Congress. Congress has created a statutory cause of action for torture, the Torture Victims Protection Act. And Sosa and Jensen are both ATS cases, and they say, look at this second prong, right? And if the ATS statutory existence was enough, there'd be no point in the second part of the test. Yes, Your Honor. And I would particularly point the court to pages 264 and 265 of Jesner. The court begins by – I said it wrong. So it's Jesner, not Jensen. There's a lot of cases, Your Honor. The court begins at 264 by looking at Sosa and says, Sosa is consistent with our general Bivens principles, where the court has been overtly hostile to new causes of action. It cites Ziegler, right? It cites what, Your Honor? Ziegler. It cites Ziegler, for sure. And then the next two paragraphs, the court talks about cases like Ziegler, where the court had established a very stringent test for judgment causes of action. And then the next paragraph, the court reaches the question, well, do all these Bivens precedents, do they apply in the ATS context? And this is what the court said about that. The court said, neither the language of the ATS nor the precedents interpreting it support an exception to these general principles in this context. In fact, the separation of powers concerns that counsel against courts creating private rights of action apply with particular force in the context of ATS. And in Jessamine, the court adopted the exact same language for the test that's being applied in Bivens, Step 2 of Bivens and Step 2 of ATS. And we have wartime context. That's a reason to defer to Congress. Congress has repeatedly legislated in this area. We have the Anti-Torture Act. We have the Torture Victims Protection Act. We have the War Crimes Act. We have the Military Extraterritorial Jurisdiction Act. Congress has repeatedly legislated and not created a cause of action here. And we know from Supreme Court case law, like Goldie, like Ziegler, that when Congress has repeatedly legislated in an area, that's a particular reason for courts to stay their hand and defer to the cause of action Congress has decided to create. And the district court actually reached the opposite conclusion and said, well, Congress has legislated in this area, so that means it would be comfortable with me filling in some gaps. And Ziegler and Goldie make clear that it's actually the opposite conclusion that should be drawn. And then we have the Administrative Claims Regime, which this court and the Supreme Court have repeatedly held, if there's an administrative claim available, which there is, the Secretary of Defense made clear that it would take and consider administrative claims of detainee abuse coming out of Abu Ghraib prison. The lesson from that is that courts should not create a cause of action, even if that administrative claim is inadequate. In Bulger, Dyer, the administrative claims process was either viewed as inadequate or unavailable to that plaintiff. And the court said, well, that's sorry, but when there's an administrative claim process available, courts should not be in the business of creating cause of action because that's Congress's job. Six years ago, we were in Spartanburg, South Carolina, and this panel told plaintiffs exactly what they would need to show to make out a domestic application of the statute. So moving from judge cause of action to extraterritoriality, and Your Honor, Judge Qualiban said they needed not just theories, but evidence with JA sites of the conduct that happened in the United States. And Judge Floyd pointed out that this case rises and falls on that. And they don't have conspiratorial conduct in the United States. Nestle made clear. Nestle, the court was concerned with, is the focus of the statute the primary violation, or is it the secondary claim? And the court said, we don't need to decide because that case was aiding and abetting. And it said, even if it's aiding and abetting, the plaintiffs lose because nearly all the conduct, not even all, but nearly all the conduct that qualifies as aiding and abetting occurred overseas. So if the focus is conspiracy, which we submit that it's actually the primary tort, all the conspiratorial conduct, the only conspiracy the district judge instructed the jury on, occurred in Iraq. And that would make this an extraterritorial application of the statute. Before you sit down, will you comment on the fact that there are some John Doe defendants and what the status of those defendants are and what they do, if anything, to whether we have finality below? Yes, Your Honor. So after the plaintiffs dismissed their claims of direct abuse by CACI, we third-partied in the United States, and John Doe is, I think, 1 to 60. And those would be soldiers who actually abused plaintiffs. The district court severed those claims. As a practical matter, we don't really have an ability to pursue them because the state secret's privilege is going to prevent us from learning their identities. But severed claims are treated as independent actions for purposes of finality and appealability. The leading case on that is Gaffney v. Riverboat Services of Indiana, which is 451 F. 3rd 424, pages 440 to 441. That's the Seventh Circuit. This court in Crouse v. Town of Monks Corner, 848 F. 3rd 576, 582 Note 2. It's a 2017 decision. Cited Gaffney with approval. And we think that's right. When a claim is severed, it's treated as a separate, as if it's now a separate action for purposes of finality. If it had been set for separate trials, it would not. But severance and separate trials are treated differently for finality and appealability. That means if it's ongoing, it's a separate matter that we don't have to consider at all? That's exactly right, Your Honor. It's not before the court. It's not part of the final judgment. As I said, it's a practical matter. It's a claim that we're never going to be able to prosecute because of the state secret's privilege. But it does not affect finality or appealability of the final judgment the district court entered for this case. Thank you. All right. Thank you. Good morning. May it please the court. Bahar Azmi for the plaintiffs. I'll be taking 14 minutes to address the call the fed court's questions. In the case of my colleague, we'll address some evidentiary issues. Your Honor, we all agree that the Nestle focus test applies here, including the district court who spent 20 pages analyzing the facts under the Nestle focus test. We have some disagreement about the continuing vitality of Alshamari 3 and the touch of concern test because we do think those tests are related. The district court did do that but decided the case based on Alshamari 3. Respectfully, no, Your Honor. She applied the focus test and asked this critical question. What is the focus of the ATS, which Caffey has not done? And to find the focus of the ATS, Abitron suggests you look to the object of the statute solicitude, which includes the interest it seeks to protect, the conduct it seeks to regulate, or the parties it seeks to protect. And the Supreme Court has told us what interests the ATS seeks to vindicate. It's from the Jesner opinion. It seeks to promote international harmony by providing a remedy, judicial remedy, for international law violations where otherwise the U.S. would be held responsible. That's repeated in Kiobel and Alito and Gorsuch in respective opinions underscore that that is the focus. And that's the test she applied, rejecting the idea that the particular location of the tort is what matters. And I want to sort of clear some conceptual errors for Caffey before I go into the extensive, what the district court called, after the trial, quote, extensive, extensive conduct in the United States that relates to the focus. The first suggestion from Caffey is that all facets of the tort have to occur inside the United States. Well, that conflates the theory of liability, which is conspiracy, with the question of extraterritoriality. We don't have to show that all the overt acts and the conspiracy happened in the United States. We just have to show that conduct relevant to the focus happened in the United States. And opposing counsel says that all of it occurred in Iraq, that none of it occurred here. So I think you're about to list. It would be helpful if you would list. Let me please. Yes, Your Honor. I think there are two sets of factors. First is the U.S. dominion over the relevant territory. And we call this the complete jurisdiction control. And I want to be clear here. We do believe that you could decide that the presumption doesn't apply at the threshold because the point of the presumption of extraterritoriality is would you create foreign entanglements, or as the Albatron case said, for foreign conduct we apply foreign law. But what's critical here is there was no foreign law in existence at the time. The United States occupied Iraq under the CPA, displaced all Iraqi law. And under the CPA, there's more facts to this that I recommend from the Fed Court's amicus brief. The key fact is it immunized khaki from Iraqi law and required that U.S. law apply. So as the district court concluded, that's certainly relevant to the focus because this harm would be attributed to U.S. actors and the United States if we failed to provide a remedy for this well-known tort. And then there's continental U.S. conduct. And I want to suggest that it is far exceeds the conclusory allegations of general corporate liability in Nestle and shows a very tight connection. First, khaki is incorrect. The U.S. corporate status is still relevant. It's not dispositive, that's clear. But it's still relevant to the focus because of attribution. And in this case, I would suggest there's a beginning, middle, and an end to the set of facts that are directly connecting the U.S. conduct with the ultimate tort, again, unlike Nestle. At the beginning, the key fact is khaki recruited, hired, and gave security clearances to several interrogators that khaki sent to Iraq despite the obligation to identify resident experts and despite the obligation to supervise, including supervise to prevent mistreatment, engaged in the very conspiracy with the U.S. soldiers in this case that led to their court-martial. Khaki cites Adhikari. What's interesting about Adhikari, although it goes the other way, the number one factor Adhikari analyzes, this is a forced trafficking case, is where did the recruitment take place that made the tort possible? The recruitment that took place in Adhikari happened in Nepal, Jordan, and Iraq. Here, the recruitment happened domestically, and it directly caused the tort at issue. Then we have the middle set of factors, which is, again, in Nestle, the court emphasizes there was basically zero presence in Cote d'Ivoire by the U.S. company. Khaki is all over Abu Ghraib and Iraq. They have a supervisory structure on the ground that has an in-country manager and the site lead. They don't talk about Dan Provosnick in their brief. He was critical in this case, and according to that supervisory structure, he provided operational supervision, his words over interrogators, and had daily communications with headquarters about things like hiring and firing. In the middle, also, there is this... And that was done from the United States? No, there was... None of the supervisory efforts occurred in the United States? There were, because there were reports back, for example... So that's what I'm looking for, anyway, is that list of conspiratorial conduct that occurred in the United States. Yes, so for example, Richard Arant, in what the district court characterized as a smoking gun email in October, said that he was leaving because of problematic interrogations, and Amy Jensen Monaghan, the program manager in Virginia, testified that they did nothing to follow up on that investigation, representing deliberate indifference. And then Dan Provosnick himself. This is about the focus and attribution. He lies not only once, but twice, to the Army about Arant. The first time, he tells them the reason Richard Arant left was he needed cataract surgery. And then the second time, that's in October, the second time in January, the military asks him, do you have any information that's relevant to mistreatment? Dan Provosnick says, no. And then there's... And he's also told by Torin Nelson, a khaki employee who testified for plaintiffs, that Provosnick was told about these abuses. So there's this connection. And then I want to get to the... Let me do the last set of facts, Judge Fackler. Let me suggest to you, Judge Brekker listed 10 different things to wrap it up so you can get to the implied cause of action thing. In the end, it was reports that included a desire to cover up abuse quietly, letting go a khaki interrogator who provided information to the Army CID, communications from military and in-country personnel regarding response to leaked photographs. She listed 10 things in the record that were domestic activity by khaki. That's right. Including... And then the cover-up is key. And Alshamari and Adhikari say cover-up is important. And it's obviously important, the focus, because if you cover up a tort, that implicates the United States. And the United States sent... The Army sent khaki a picture of DJ, one of the unqualified interrogators, the co-conspirators, in a stressed position and suggested he be terminated. Khaki minimized to say this is just the cultural preferences of Iraqis. How about the implied cause of action? Thank you, Your Honor. Yes. This is so fundamentally unlike a Bivens cause of action, as you observe. The problem, ATS is a federal statute that authorizes federal courts through congressional choice to imply causes of action. The problem with Bivens is there is zero congressional imprimatur whatsoever. And the Hernandez case also emphasizes the problem with a Bivens cause of action is the Fourth Amendment might provide a norm that people should follow, but there's no remedy attached, and Congress should make remedy. The ATS reflects, quote, a congressional choice, that's SOSA, to provide causes of action. In the very case they rely on, Judge Floyd and Judge Quattlebaum, Jessner says everyone understands that this was not a piece of, quote, legislation that was meant to sit on a shelf. It was understood that federal courts would identify causes of action, and it's sure, sure, Jessner cites to Ziegler around sort of judicial caution, but the decision is really ultimately limited to the idea that you should not, consistent with the focus of the ATS, subject a foreign corporation, because suing them would cause discord. Here all of the sort of factors, as Your Honor suggested, Floyd, support a cause of action. We have congressional endorsement via the Geneva Convention, the Convention Against Torture, the Torture Victim Protection Act, which really seeks to provide the same remedy, Congress says this, we want the same torture remedy that exists for aliens, for U.S. citizens. Then we have executive conduct here through signing of the Geneva Conventions and military law and policy, which required adherence to the Geneva Conventions, prescribed the conduct here, and court martial, so very co-conspirators in this case. Let me make sure I understand where you're going with that. I certainly appreciate the United States official action that adopts and approves those international treaties and conventions and things. But isn't the question whether they, it seems like you're saying because the United States has taken action that would be consistent with, or that says torture and this sort of detainee treatment is improper, illegal, whatever, that that implies that there would be a cause of action that could be pursued against it. Let me be focused. And I think the way the test that Sosa talks about and the test that Jesner, I got it right, at least now, that Jesner then talks about as well, is requiring an analysis of whether a cause of action would be disruptive based on other things. And so why shouldn't we view the fact that there's never been a cause of action created as evidence that despite all this action by the executive and legislative branches, there isn't one? There is a cause of action for torture because the Supreme Court in Sosa endorses the cause of action for torture, as have numerous courts. So that much is clear. And then at step two, of course, we exhibit some judicial caution, but it goes back to the focus. The reason I identified the political branch's adherence to the anti-torture norm because it goes to the focus, which is will we create foreign entanglements if we don't provide a remedy here? That's from Jesner. And given the universal consensus about the norm of torture, failing to provide a U.S. remedy would severely implicate the United States and the focus of the PTS. Well, you know, Justice Breyer in Sosa even said something to the effect that notwithstanding Erie, international norms keep the door ajar. He said that twice. For a new common law, the causes of action, because for two centuries, domestic law has recognized the law of nations. That's right. And Breyer's keep the door ajar, Breyer's quoting the majority opinion in Sosa. And Sosa also says the ATS's unfortunate word is not meant to be stillborn. We understand that despite Erie, Congress has asked federal courts to create this cause of action rather than federal courts independently on their own, you know, creating one. And I think that's important. I think, I appreciate Judd Floyd's right about that. And I think the question is how we, the door is ajar under current law, but the way we determine whether cause of action fits in that ajar door is the second, the two steps of Sosa and now Jessner. You agree with that's the framework?  Okay. And I just think at the second step, there's no reason to exhibit caution given the constellation of factors that are connected to the remedy, which is, you know, sorry, connected to the focus, which is offering a remedy where the U.S. be implicated. And, you know, just this, if I just, I'm nearly out of time. You're actually out of time. Okay. If I could just take one moment, Your Honor. Go ahead. This is, you know, contrary to the suggestion, this is some kind of exotic case. This is the rare case that sits at the juncture between the presumption against extraterritoriality and the focus. So providing a remedy here wouldn't implicate the presumption against extraterritoriality because we're not conflicting with any foreign law. And avoiding a remedy here would implicate the focus because it would not provide a remedy for very serious international law violations. Thank you. Good morning, Your Honors. Michael Buchanan, pro bono counsel from Patterson-Belknap on behalf of the U.S. Department of Justice. And I just want to address briefly some comments that Mr. O'Connor made in his statements. Primarily, the idea that the state secrets frustrated the truth-seeking process in the district court. We believe, and the record shows, that this case was fairly litigated in the district court and that Kaki presented its defenses through unclassified Army evidence, including internal memos, the testimony of Army and Kaki interrogators, and its own witnesses in the cross-examination of the plaintiffs. And they concede as much in moving for post-trial relief, claiming in their papers that the evidence they presented on, for example, the borrowed servant doctrine, their primary defense, was overwhelming and that they should prevail on that defense. In addition, nothing- Counsel, can I ask you a question about the state secret issue? This was a little bit surprising to me because it feels like the district court upheld the state secret in certain aspects and made trial decisions based on it. It seems kind of like an abuse of discretion sort of process. But it looks like El Masri or Masri is pretty clear that both the testimony and whether to dismiss or not, and how you handle it, are questions of law. Do you agree that they're questions of law? Partially. With regard to the assertion of the state secret privilege in El Masri and other cases relied upon, by Kaki, the government, with sworn statements, represented that the entire programs, the personnel and the contracts that were subject to litigation were themselves- That's really not my question. It's how you deal with it in terms of the trial, including dismissals or not. Doesn't El Masri say that's a question of law, too? With regard to the evidentiary rulings, Your Honor, if that's what you're referring to, those are abuse of discretion standards. So there was substantial evidence available to Kaki to prevent this. But they're saying it should have been dismissed based on the state secrets privilege. That is a question of law? I think it's a question of law, in fact, Your Honor, because the question is, is the information that's classified so central that the party cannot present its defense or its case? That's the test. That's how you show it. I'll just read the case. I'm pretty sure El Masri says that's a question of law, the decision on the test you just described. I think from the perspective that the court is looking at this now, the question is, was Kaki able to present its defense? And the answer is yes, both on the borrowed servant and on the substance. For example, nothing prevented Kaki from calling its own interrogators to testify at trial, just as they did with Mr. Stavanovich and just as the plaintiffs did with Mr. Nelson. Those witnesses were available. They could testify about what they saw and what they did in Iraq. And there was no reason they could not have been called. With regard to their defense on the conspiracy theory, their theory, which we disagree with, is that a particular Kaki interrogator had to be assigned to a particular plaintiff. They had the sworn testimony of all interrogators assigned to the plaintiffs in this case. They took that testimony. They all denied abuse. They presented it to the jury. So they fully and fairly presented their defenses to the jury, and the jury rejected them. Well, that you say fully, I mean, whether this rises to the level of a constitutional violation, it might be debatable. But it was different than in a normal trial. I mean, you've got to at least recognize that the way discovery went, and they weren't allowed to get things that would normally be within the purview of discovery. And within the way the trial went, they weren't allowed to do things that would normally happen during trial. Now, that seems undeniable. The question then is, is it enough and prejudicial enough that it violates the due process clause? That may be a high bar, and maybe they don't get there. But just to say fully, like they got everything they wanted, that seems kind of like you're just ignoring what happened. Not suggesting that they got everything they wanted, but they got enough to present their cases fully. And I think this case is like the Reynolds case in the Supreme Court, where the government offered a reasonable alternative to the evidence and provided them with evidence that they needed for their case. And briefly, on the conspiracy point, I would point the court to a case that Kaki relies upon, Oki's Semiconductor. The liability for acts of co-conspirators, quotes, quote, reflects the notion that the damage is wrought by the conspiracy, is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. So what the conspiracy theory here and conspiracy liability is a direct application of black letter law. We are holding Kaki accountable for the actions of its Kaki interrogators meeting with military police outside the formal interrogation process and giving them instructions to abuse detainees, plural, indiscriminately across the board. And you see that in the photos. That's exactly, they took those instructions to heart. That's exactly what they did. Widespread nudity was rampant. It was standard operating procedure within the facility, and numerous detainees suffered exactly the kinds of abuse that our clients suffered. Thank you, Your Honors. All right, thank you. May it please the Court. Mike Shee for the government. I want to take a step back and focus on the particular claims that brought the United States here, and those are the claims in CACI's third-party complaint against the United States. Those claims, as we explained in our brief, are barred by federal sovereign immunity, and the Court's contrary conclusion violated decades of precedent from the Supreme Court and from this Court. On appeal, CACI doesn't merely decline to defend the district court's analysis of sovereign immunity. CACI actually agrees that the district court got it, quote, patently incorrect. So the Court should affirm the dismissal of CACI's third-party claims against the United States on sovereign immunity grounds. I'm happy to answer any questions the Court has on federal sovereign immunity. Otherwise, we're happy to rest on the arguments in our brief. Do you have a position on the John Doe defendants? Yes. So as we point out in the first footnote to our brief, our understanding of the finality issue is the same as CACI's understanding. The claims against the John Doe defendants appear to have been completely severed, and because they were completely severed, it's basically a new case. And so there's no issue with finality as far as we can see under the Seventh Circuit decision that they point to and this Court's endorsement of it in that footnote in the case that we cited there. Thank you, Counsel. Great. Thank you. All right. Thank you. We'll hear from Mr. O'Connor again. Thank you, Your Honor. Mr. Osme, in talking about extraterritoriality, told the Court that status is irrelevant, the recruiting in the United States is relevant to extraterritoriality, U.S. citizenship is relevant. All of that is directly foreclosed by Nestle and Avatron. Avatron couldn't be clearer in saying the only things that are relevant are conduct, because it's too easy to take interests, statuses, et cetera, and twist an extraterritorial claim into a domestic claim. He went on and talked about some of the things that the District Court mentioned in other U.S. activities related to reports and cover-up and things like that. What's your position on that? That's the other side of the coin. Nestle makes clear that general corporate activity is also not sufficient. That's not general corporate activity. That's activity related to the specific allegations here. They're saying evidence that not just general activity, but things peculiar to the mistreatment of these detainees happened in the U.S. Well, Your Honor, I would submit that the Court should look closely at the citations on which plaintiffs rely. They talk about reports. The government report or the reports from CACI back to the United States, there are 12171 to 12358. There's 175 pages of them. The Court won't find one discussion of intelligence gathering, of detainees, of treatment of detainees. It's all administrative stuff. The Arendt email, which is at JA8158, that if the Court reads Mr. Arendt's email, all he says is he saw a violation of the interrogation rules of engagement, which he doesn't specify, by junior enlisted soldiers. He's very clear that CACI personnel had nothing to do with it and that he had the highest regard for all the CACI personnel with whom he'd interacted. Well, Mr. O'Connor, since you brought up citations, there are a number of citations in your briefing that don't appear to be accurate. And one example is in your reply brief on pages 21 to 22 where you quote Hensley, and that quote doesn't exist. It's not accurate. The quote I'm talking about on pages 21 to 22 is it says, quote, preemption is designed to further the, quote, federal interest in eliminating non-federal tort regulation of the military during wartime, but that's not an accurate quote. Your Honor, I'd have to go back and look at Hensley. Certainly that's what the Court said, whether the quote is right or wrong. Well, you put it in quotes in your reply brief, and that's not accurate. And there are a few other instances of that in your briefing. So I'm just bringing it up since you mentioned that we should look closely at citations. So we've looked closely at yours, and I think probably, unless my colleagues have more questions for you about that now, probably what's more fair to you is perhaps we'll follow up with something listing all the inaccuracies in your briefing so that you could respond. Thank you, Your Honor. I'll give you one more on damages. Kaki contends that it appears that courts borrowed forum damages law from ATS claims. This is really an overstatement. We don't borrow forum damages in assessing damages. None of the courts imposing damages under ATS consider the following factors, not what you said, but what I just pointed out to you. So that will be included in the follow-up, too. I appreciate that, Your Honor. I see my time has expired. Do you have any more questions? All right. Thank you.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., Henry F. Floyd